LA FRANCE WINE CO., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
La France Wine Co. v. Commissioner
Docket No. 6027-73.
United States Tax Court
T.C. Memo 1974-254; 1974 Tax Ct. Memo LEXIS 70; 33 T.C.M. (CCH) 1130; T.C.M. (RIA) 74254; September 23, 1974, Filed. Lee A. Hansen, for the petitioner. Gregory M. Hansen and Joseph M. Wetzel, for the respondent. QUEALY
MEMORANDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: The Commissioner determined a deficiency in income taxes due from the petitioner for the calendar year 1971 in the amount of $19,099.24. The sole question for decision is whether an expenditure of $40,810.33 incurred by the petitioner to replace a section of the flooring of a building acquired in that year is deductible as an ordinary and necessary expense within the meaning of section 162. [1]
*71 FINDINGS OF FACT Some of the facts have been stipulated by the parties. Such facts and the exhibits attached thereto are incorporated herein by this reference. La France Wine Co. (hereinafter referred to as the "petitioner"), is an Oregon corporation, which, at the time it filed its petitioner herein, had its principal place of business at Portland, Oregon. The Federal income tax return for petitioner for the calendar year 1971 was filed with the Western Region Service Center in Ogden, Utah. In November of 1970, petitioner purchased certain real property in Portland, Oregon, including a building to be used for warehousing of its inventory and as its office and principal place of business. The total purchase price was $60,000 of which $35,676 was allocated as the cost of the building and $24,324 was allocated as the cost of the land. At the time of purchase, the building was approximately 40 years of age, was constructed of cinder block with a full concrete basement of approximately 9600 square feet, a main floor of approximately 9600 square feet, and a mezzanine level. The main floor of the building was constructed of laminated wood 2 x 6's supported by wood beams and *72 posts. Approximately two-thirds of this floor toward the front or north side of the building was covered with a 3-inch layer of concrete.The approximately one-third area of the floor toward the rear or south side of the building was elevated approximately 2 feet above the level of the rest of the floor. There were partitions in this area enclosing what had in the past been used as fresh fruit and vegetable coolers. The floor of this area had a layer of felt paper, a layer of cork, a layer of concrete, and a layer of asphalt emulsion over the laminated 2 x 6's resting on wooden beams supported by wooden posts or columns. At the time the building was purchased, the petitioner anticipated that certain improvements had to be made before it could use the building for its principal place of business. Petitioner caused these improvements to be undertaken pursuant to a plan of remodeling which included construction of an office within the building, installation of a new roof, installation of electrical wiring, construction of a concrete loading dock, installation of heating and cooling equipment, and blocking in of the window spaces of the building. When the remodeling work was approaching *73 completion, the contractor proceeded to remove the partitions at the rear of the first floor area. Dry rot was discovered in the floor, supporting beams and posts which had progressed to the extent that the entire area of about one-third of the main floor was completely unuseable and in imminent danger of collapsing. At the time of the purchase of the building, petitioner had no knowledge of the dry rot condition, and the purchase price was based upon the assumption that the building was sound with sound floors, suitable for use as a warehouse for storage of wine and beer. The damage caused by the dry rot condition made the building unfit for the use for which petitioner had purchased it. A structural engineer was called in to determine what should be done to correct the newly discovered dry-rotted area. The engineer prepared three alternative floor plans to replace the area of damaged floor. Two of these plans involved wooden floor replacements, and the third involved concrete core flooring. These plans called for a load capacity of 150 pounds per square foot, the same capacity as the floor which had been removed. Upon considering these proposals, it was concluded that a *74 concrete core floor, with a load capacity of 300 pounds per square foot, could be installed for about $1,000 more than a floor of the same construction with a load capacity of 150 pounds per square foot would have cost. Petitioner thereupon authorized replacement of the damaged floor with concrete core flooring having a capacity of 300 pounds per square foot.
All areas of dry rot in the building were removed and replaced with other materials. Any deterioration of the wood in the structure was completely arrested, and the new area of concrete floor is incapable of deteriorating due to dry rot, insects, or other such factors harmful to wood. The strength, or weight-bearing capacity, of the floor in the building at the time it was purchased was 150 pounds per square foot in the areas where the floor was not dry rotted. The weight-bearing capacity of the new concrete core floor, 300 pounds per square foot, was double that of the original floor. This correspondingly doubled the potential storage capacity of the portion of the warehouse where the new floor was installed. The correction of the dry-rot damage to the floor was completed sometime in May 1971 at a cost of $40,810.33.In *75 addition, the petitioner expended a total of $14,894.75 in improvements and repairs to the building, primarily in accordance with its original plans. The petitioner moved its business into the building on or about June 1, 1971. In its income tax return for the taxable year 1971, petitioner capitalized the sum of $14,894.75 expended pursuant to its original plan for the modification and repair of the building. However, the petitioner deducted the additional sum of $40,810.33 expended to replace the flooring and correct the conditions brought about by dry rot to the portion of the warehouse flooring referred to above. The respondent contends that this amount should likewise be capitalized. OPINION There is no dispute with respect to the facts in this case. Petitioner purchased an old building with the intention of remodeling it for use in its business. In the course of the remodeling, it was discovered that about one-third of the floor area was in danger of imminent collapse due to the rotting of the timbers. Before the petitioner could use the building, this situation had to be corrected. Petitioner elected to replace the wood flooring with precast concrete and to lower *76 the level of the floor. In doing so, petitioner increased the floor load of this area from 150 pounds per square foot to 300 pounds per square foot, thereby increasing proportionately its storage capacity. For some unascertainable reason, petitioner seeks to distinguish between the expenditures incurred in accordance with its original restoration plan and the unanticipated expenditures incurred on account of the rotten condition of the warehouse floor, which was not known to the petitioner at the time it purchased the building. We fail to see any basis for distinction. As a practical matter, in the remodeling of any old building, it is only reasonable to expect that unforeseen costs will be incurred. If this case is unusual, it is only because of the magnitude of such costs. Petitioner claims that the cost of the replacement of the floor meets the definition of "repairs," allowable as a deduction pursuant to section 1.162-4, Income Tax Regs. That regulation defines repairs, as follows: § 1.162-4 Repairs. The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating *77 condition, may be deducted as an expense, provided the cost of acquisition or production or the gain or loss basis of the taxpayer's plant, equipment, or other property, as the case may be, is not increased by the amount of such expenditures. Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property, shall either be capitalized and depreciated in accordance with section 167 or charged against the depreciation reserve if such an account is kept. Petitioner argues that the expenditure in question did not increase either the value or the useful life of the building. The fallacy of this argument stems from the fact that petitioner starts with the premise that the value or useful life of the building must be determined by reference to the condition which petitioner presumed to exist at the time of purchase, rather than the actual condition of the building. If we are to accept the petitioner's evidence, the building had little if any value and no useful life in the condition that existed at the time of the purchase. When looked upon in that light, it would be absurd to argue that the replacement of the rotted *78 flooring and the reinforcement of the supporting walls did not enhance the value of the building and extend its useful life. To this must be added the further enhancement which resulted from increasing the capacity of the warehouse. Furthermore, the regulation relied on by the petitioner was intended primarily to provide a basis for distinguishing between repairs deductible as expense items and major expenditures which must be capitalized or charged against the depreciation reserve in the case of property then being used by a taxpayer in its trade or business. Before the property has been put into use, a taxpayer does not have any depreciation reserve. The facts in this case show that until the work in question had been completed the building had not been and could not be used by the petitioner in its trade or business. Restoration of a 40-year old building before it could be put into use cannot, in principle, be distinguished from the purchase of the land and the erection of a new building. Finally, if the petitioner had purchased the building knowing that the warehouse floor had to be replaced, it could not be seriously argued that the cost of such replacement should be charged *79 to expense and deducted under section 162. Lack of such knowledge may result in the payment by the petitioner of an excessive price to purchase the building but does not change the character of the expenditure. Accordingly, the expenditure in question should be capitalized and added to the petitioner's cost of the property. California Casket Co., 19 T.C. 32 (1952); Ethyl M. Cox, 17 T.C. 1287 (1952). Cf. United States v. Wehrli, 400 F.2d 686 (C.A. 10, 1968). Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated. ↩